# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 19-485


**KARL JUDE HENSGENS**

**VERSUS**

**ALANNA WINGATE HENSGENS**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 2017-10204-M
HONORABLE CHARLES G. FITZGERALD, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JOHN E. CONERY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Shannon J. Gremillion, and John E. Conery, Judges.


**AFFIRMED.**

**Jack Derrick Miller**
**(A Professional Law Corporation)**
**415 North Parkerson Avenue**
**Crowley, Louisiana  70527**
**(337) 788-0768**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Karl Jude Hensgens**

**Helen Popich Harris**
**Helen Popich Harris (APLC)**
**321 West Main Street, Suite 2-D**
**Lafayette, Louisiana  70501**
**(337) 291-6092**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Alanna Wingate Hensgens**

**CONERY, Judge.**

Following the parties' divorce, Defendant sought interim spousal support as well as child support for the couple's three minor children. Plaintiff cited a downturn in his farming operation in reporting a period of negative income for calculation of support. The trial court rejected that evidence after finding that Plaintiff's accounting methodology was inconsistent with La.R.S. 9:315(C)(3)(c). The trial court instead relied upon the Defendant's expert in accounting to shape orders of both child and interim spousal support. Plaintiff appeals both awards.

## FACTS AND PROCEDURAL HISTORY

The parties, Karl and Alanna Hensgens, were married in 2006. The couple have three daughters. Karl filed a petition for divorce on March 7, 2017, which was granted by a July 18, 2018 judgment of divorce. The judgment terminated the community retroactive to the filing of the petition.

The trial court thereafter considered ancillary matters,[1] including Alanna's request for child support and interim spousal support. During a two-day hearing, the parties presented expert testimony regarding Karl's income as a rice and crawfish farmer in support of their positions regarding issues of support. Karl relied on calculations reflecting a negative income balance over a period of several years due to difficulties experienced in that industry, including the 2016 flood event. He explained that he had no more liquid assets and referenced a lawsuit pending against the couple due to failure to repay farming loans.

Alanna on the other hand presented expert testimony drawn, in part, from the couple's income tax returns and which reported funds available for support. As

---

[1] The trial court named Alanna the domiciliary parent. Custody issues are not at issue in this proceeding.

discussed in more detail below, the parties differed on issues related to accounting methodology as well as whether sources of income were recurring and whether certain expenses were business related for purposes of calculating support.

The trial court ultimately rejected Karl's assertion that he had negative income as estimated by his expert through use of an accounting method that relied on income/expenses related to the crop year. Citing La.R.S. 9:315(C)(3)(c), the trial court instead favored Alanna's expert's use of cash basis accounting and explained that choice in extensive written reasons. As a result, the trial court ordered Karl to pay $2,897.70 per month in child support, a figure that included agreed upon sums for private school tuition, associated fees, and costs. The trial court further ordered Karl to pay Alanna interim spousal support of $3,085.00 per month.

Karl appeals, asserting that the trial court erred in:

1.     Failing to average the farm income over a period of time, while basing his opinion upon the farm income of a single, extremely atypical year.

2.     Failing to reduce Karl's income by one-half of the farm income for the 2017 crop year, which belonged to Alanna.

3.     Failing to reduce Karl's income by one-half of the government payments for the 2017 crop year, which belonged to Alanna.

4.     Failing to exclude, as income, the sale of farm equipment and while including it failed to consider that one-half of the proceeds belonged to Alanna.

5.     Failing to reduce Karl's income and/or deviate from the child support guidelines relative to the debt owed to the Bank of Commerce as set forth in the lawsuit marked as exhibit K-3.

6.     Failing to attribute one-half of the revenue from crop sales, government payments and the sale of farm equipment to Alanna.

*Child Support*

Karl advances numerous arguments regarding the trial court's calculation of farming income for purposes of assessing support obligations. Karl testified that the crawfish and rice farming operation has been sustained each year by farm loans and by government farming assistance.[2] He explained, however, that the operation "got behind" and "was barely getting by" before the August 2016 flood "wiped out everything." He explained that the flooding affected both rice and crawfish crops.

After the Hensgens allegedly failed to pay several of their farm loans, the lender, Bank of Commerce, filed suit against the couple in July 2018. The Bank's petition cited a balance due on promissory notes from March 2015 ($415,800), April 2016 ($486,750), and from August 2016 ($50,065). This difficult financial situation, Karl suggests, undermines the trial court's determinations regarding his income for purposes of support.

In assessing Karl's gross income, the trial court extensively referenced La.R.S. 9:315(C)(3)(c), which provides:

> (3) "Gross income" means:
>
> . . . .
>
> (c) Gross receipts minus ordinary and necessary expenses required to produce income, for purposes of income from self-employment, rent, royalties, proprietorship of a business, or joint ownership or a partnership or closely held corporation. "Ordinary and necessary expenses" shall not include amounts allowable by the

---

[2] While there was not extensive testimony regarding the government assistance, Karl explained the connection between the loans and assistance as follows:

> [W]hen you sell your crop it will not pay back the loan and that's why you have a government payment. It's supposed to offset that doesn't come until after you sell your crop is the bad part. So you don't know if the government payment added with your price of the rice is going to pay off the loan because it goes off the average selling point.

Internal Revenue Service for the accelerated component of depreciation expenses or investment tax credits or any other business expenses determined by the court to be inappropriate for determining gross income for purposes of calculating child support.

*Id.* (emphasis added).

This statute, the trial court determined, was consistent with the accounting method relied upon by Alanna's expert in accounting, Chris Rainey, C.P.A. Mr. Rainey, who employed a cash method of accounting, reviewed, in part, the Hensgens' tax returns for 2016 and 2017 for insight into the farm business's "gross receipts minus ordinary and necessary expenses required to produce income" for those years. With those income/expense figures provided by the returns, Mr. Rainey explained that he made "adjustments" to the return as required by La.R.S. 9:315(C)(3)(c).

Mr. Rainey distinguished the cash basis method from the accrual based accounting method advanced by Karl's expert, Steven Soileau, C.P.A. Cash basis, Mr. Rainey explained, accounts for income when it is received and not earned, whereas the accrual basis accounts for when it is earned and not received. The cash basis method also accounts for expenses as they are actually paid. Mr. Rainey thus reasoned that the former method better reflects income available for child support on a year-to-year basis. Mr. Rainey's calculations were presented to the trial court through "Exhibit Wingate 1," a spreadsheet reflecting gross monthly income of $11,472 in 2016 and $16,572 in 2017.

Karl's expert, Mr. Soileau, testified that although he prepared the Hensgens' tax returns for the previous five years, the returns did not provide an accurate picture of income. He reasoned instead that the cyclical nature of farming required that expenses must be matched with corresponding revenue as expenses are often incurred in one year, but crops may not be sold until the following year. On that

4

latter point, he explained that not all of a rice crop may be sold in the year in which it is grown, but that it may be stored for some period in order to receive a better price at a later time. Noting that farming expenses and revenue may vary widely on a year-to-year basis, Mr. Soileau presented figures related to a five-year period through the use of "Exhibit K-2". Entitled "Profit per Crop Year 2013-2017," the document listed "Net farm income" of $38,266 in 2013 and negative income of "($64,317)," ($202,630),'' and ($217,744)" in 2014, 2015, and 2016, respectively. Mr. Soileau identified nominal income of $1,587 for 2017. In contrast, Mr. Rainey calculated gross annual income of $137,666 in 2016 and $198,867 in 2017.

The trial court determined that the cash basis method of accounting was appropriate but concluded that Mr. Rainey's 2016 calculations should not be considered. Rather, a significant payment received by the Hensgens for damages related to the BP oil spill[3] rendered that year's income an outlier. The trial court thus established Karl's gross monthly income based on figures from Mr. Rainey's 2017 calculations alone. The court also adjusted several aspects of Mr. Rainey's calculations.[4]

---

[3] Exhibit Wingate 1 indicates that the Hensgens received a $93,374 settlement related to the oil spill in 2016.

[4] For instance, Mr. Rainey reclassified Karl's fuel and oil usage previously identified as a business expense for tax purposes to fifty percent personal. The trial court instead attributed on twenty-five percent to Karl's personal use. He made several further adjustments to expenditures for automobile insurance, telephone, and depreciation on the couple's vehicles. The trial court also identified a 2017 cash proceed from a life insurance policy as non-recurring and, therefore, removed it from the calculation of gross income for 2017.

The trial court did not include Mr. Rainey's estimates regarding potential income from unreported crawfish sales. The trial court instead rejected that estimated income as "too speculative."

<u>Standard of Review</u>

Before turning to Karl's specific arguments, we first note that "[w]e review child support determinations using the manifest error standard of review and we will not disturb the trial court's order unless it committed manifest error or abuse of discretion in its determination." *L.E.P.S. v. R.G.P.*, 10-1128, p. 8 (La.App. 3 Cir. 3/16/11), 59 So.3d 523, 528-29 (citing *State, Dep't of Soc. Servs. v. L.T.*, 05-1965 (La. 7/6/06), 934 So.2d 687), *writ denied*, 11-0770 (La. 5/27/11), 63 So.3d 999.

<u>Scope of Evidence</u>

Karl first cites error in the trial court's consideration of data from 2017 alone in calculating gross income. He suggests that a longer time span must be considered, giving farming's fluctuations. He relies, instead, on Mr. Soileau's calculations. Karl's argument, however, ignores the limited evidence found reliable by the trial court.

In fact, the trial court specifically rejected Mr. Soileau's methodology and, correspondingly, his resulting calculations. Additionally, Mr. Rainey provided details regarding income only from 2016 and 2017. With the trial court's rejection of the 2016 income due to its inclusion of the BP settlement, only data from 2017 remained. The trial court was thus left with limited evidence[5] from which to draw its own conclusions and calculations. That limitation was created by the parties' evidentiary submissions, not by error on the trial court's part. Given that limitation, the trial court assessed Karl's income under La.R.S. 9:315(C)(3)(c) in accord with the evidence chosen by the parties.

---

[5] The parties did not provide the trial court with the raw data, invoices, reports, and returns on which the experts based their calculations. Instead, the parties presented the trial court with the reports from which the experts testified.

To the extent Karl argues that the trial court erred in accepting Mr. Rainey's methodology over Mr. Soileau's use of accrual based accounting, we leave that finding undisturbed. In evaluating the expert opinions, the trial court remarked that:

> The options I had on the evidence adduced were to accept negative figures … and I went through all five years and averaged per month and it came out to I believe negative $7000 each month or that's option one … based on expert testimony. Option two, based on the other expert, Chris Rainey, to accept his conclusions of fact.

The trial court recognized the "commonsense problem" with the "negative versus the positive" before pointing out the more "fundamental problem" of reliance on Mr. Soileau's calculation. Significantly, the trial court found that the cash basis methodology presented by Mr. Rainey has a basis in law since La.R.S. 9:315(C)(3)(c) is "written as cash basis[.]"

In particular, the statute defines "gross income" as "gross receipts minus ordinary and necessary expenses required to produce income, for purposes of income from self-employment, rent, royalties, proprietorship of a business, or joint ownership or a partnership or closely held corporation." *Id.* Karl's suggestion that the trial court erred in refusing to craft an income outside of the clear legislative language is unpersuasive. Rather, La.R.S. 9:315(C)(3)(c) provides for "a very straightforward accounting analysis[,]" requiring simple consideration of receipts minus ordinary and necessary expenses as demonstrated by the controlling parent. *Scott v. Scott*, 43,455, p. 7 (La.App. 2 Cir. 8/13/08), 989 So.2d 290, 295.

While Karl maintains his argument that his declining farm practice and his inability to secure farm loans commensurate with those in the past renders the figures from 2017 unreliable, the trial court correctly recognized Karl's stipulation to the

payment of private school tuition for the children.[6]  Continuing, the trial court explained:

> The tuition you're paying far exceeds the amount of child support that I would be ordering under the accepted gross monthly income that was … accepted into evidence by me, Mr. Hensgens, offered by your expert. … Again, it doesn't make common sense nor does it make legal sense in an application of the law to the facts to come up with, essentially, a negative $7000 per month[.]

Despite that stipulation, Karl presented no data beyond the calculations of negative income from Mr. Soileau.

Having recognized both the trial court's direct application of the limited evidence presented to La.R.S. 9:315(C)(3)(c) and its observations regarding the unworkable nature of Karl's calculations, we find that the trial court's ruling is supported by the record.

Community Enterprise

A similar duality of argument is seen in three assignments that stem from Karl's contention that the trial court erred in not recognizing that the farming operation was a "community enterprise."  Such a designation, he argues, requires that one-half of the 2017 farm income be attributed to Alanna, as well as one-half of the 2017 government payments and one-half of the sale of the proceeds from the 2017 sale of farm equipment.

---

[6] The trial court restated the parties' stipulation as:

> The stipulation with respect to private school is this:  That one, private school as part and parcel of the child support obligation in calculating the total child support obligation.  Whether it is under [La.R.S. 9:]315.6.  So one, private school tuition it's coming in for the purposes of calculating total child support ….
>
> . . . .
>
> It is my understanding also in terms of the second stipulation of fact here is that for purposes of – so, if I hear no other evidence what's going to be included under [La.R.S.]9:315.6 is the figure $1,419.75[.]

This argument conflates the concept of income for assessing child support with that of ownership of property. *See* La.Civ.Code art. 2336. The distinction between the two is readily seen on reference to jurisprudence advanced by Karl for the proposition that he and Alanna operated a community enterprise. *See Lanza v. Lanza*, 04-1314, 04-1756 (La. 3/2/05), 898 So.2d 280; *Milton v. Milton*, 10-1589 (La.App. 1 Cir. 5/9/11), 71 So.3d 326, *writ denied*, 11-1168 (La. 9/16/11), 69 So.3d 1150. Both cases addressed issues related to the partition of community property. Neither matter involved assessment of "income" under La.R.S. 9:315(C)(3)(c).

Further, the parties' stipulations are contrary to Karl's argument on appeal that one-half of the "income" generated through the receipt of government payments and through the sale of farm equipment must be attributed to Alanna. The parties stipulated that Alanna was not employed at the time suit was filed and that she was earning no money until the couple's youngest child turned five. At that point, minimum wage would be imputed to Alanna. *See* La.R.S. 9:315.11. The trial court accepted that stipulation.

Recurring Income

Karl next argues that the trial court erred in including the sale of farm equipment in its calculation of income as "[t]he parties were not in the business of selling farm equipment." He suggests that as the evidence indicates that equipment was sold only in 2016 and 2017, the sale was due only to the parties' declining circumstances and their inability to further borrow money.

In ruling, the trial court maintained Mr. Rainey's inclusion of $23,000 from the sale of farm equipment as an element of Karl's 2017 income. Mr. Rainey noted that the tax returns included a $27,685 gain from the sale of farm equipment in 2016 and a $23,000 gain in 2017. Mr. Rainey explained that he included that element "as

9

a recurring item because Mr. Hensgens does frequently sell farm equipment." When challenged on cross-examination, Mr. Rainey admitted that Karl was not in the business of selling farm equipment but further explained that it was "*part* of his business operation." (Emphasis added.) He remarked that "[h]e buys equipment, he claims depreciation on that equipment as a farming expense" and that "part of the cycle is to sell older equipment when you replace it with newer equipment." Mr. Rainey explained that although he was unaware why the equipment was sold, "it wouldn't change [his] finding that he had these gains from the sale of equipment in these two years."

The trial court accepted Mr. Rainey's testimony regarding the sale of equipment as part and parcel of the farming operation, stating that "in terms of the sale of farm equipment the testimony that was adduced there - - the benefit is having accelerated depreciation. So if you have new equipment coming in and the older equipment being sold it's a tax benefit, there's no longer a tax benefit then it should come in, as income for purpose of this calculation[.]" We find no manifest error in that determination. Notably, while Karl's counsel speculates that the farming equipment was sold in order to pay for farm expenses that Karl could not otherwise meet, Karl did not testify regarding the sale of farming equipment or the motive therefor.

Characterization of Expenses

Karl also questions the trial court's determination that American Express payments in the amount of $9,382.23 were personal in nature rather than business-related. He contends that the trial court accepted Mr. Rainey's testimony on this point, despite the fact that the accountant had not "reviewed any documents to

determine whether the credit card payments were nonbusiness related." Karl's argument mistakes the applicable burden of proof, however.

Gross income is calculated as "[g]ross receipts minus ordinary and necessary expenses *required to produce income* …[.]" La.R.S. 9:315(C)(3)(c) (emphasis added). "'Ordinary and necessary expenses' shall not include … business expenses determined by the court to be inappropriate for determining gross income for purposes of calculating child support." *Id.* (emphasis added). *See also Baggett v. Baggett*, 96-453 (La. 4/23/97), 693 So.2d 264.

The expenses challenged by Karl are payments made to the couple's American Express account in the amount of $9,382.23 and claimed as business expenses on the 2017 income tax return. Mr. Rainey explained that: "In my conversations with Alanna Hensgens and in my review of the documents these expenses charged to American Express were not business expenses but were personal expenses." Without contrary evidence from Karl, the trial court was only presented with evidence indicating that the American Express expenses were for personal expenses.

Importantly, "[t]he court, of course, is not bound by the controlling parent's designation of which expenses are 'ordinary and necessary,' even if made in federal tax returns." *Dejoie v. Guidry*, 10-1542, p. 9 (La.App. 4 Cir. 7/13/11), 71 So.3d 1111, 1118, *writ denied*, 11-1779 (La. 9/2/11), 68 So.3d 520. Rather, it is "the party controlling the closely held corporation [who] must bear that burden." *Id.* (citing *Scott v. Scott*, 43,455 (La.App. 2 Cir. 8/13/08), 989 So.2d 290). As Karl sought to declare the American Express payment as a business-related expense required to produce income, he had the burden of proving that classification. Based on the record, a determination that he failed to do so is not manifestly erroneous.

11

<u>Deviation from Guidelines</u>

Moving from the calculation of his income, Karl next contends that the trial court erred in failing to account for the parties' debt to the "Bank of Commerce in an amount of $656,215.92" as well as interest and attorney fees. Karl's claim relates to the Bank's suit on three promissory notes issued in 2015 and 2016. Suit was pending at the time of trial. Karl first claims that this debt should have been considered by the trial court in its calculation of income. That argument, however, is resolved by the above discussion finding no error in the trial court's adherence to La.R.S. 9:315(C)(3)(c).

By his remaining argument, Karl alternatively contends that the trial court should have deviated from the guidelines for determination of child support. He argues that the deviation is required due to both the unpaid debt and his reliance on loans from his mother since the filing of the petition for divorce.

Louisiana Revised Statutes 9:315.1 permits a deviation from the guidelines as follows:

> A. The guidelines set forth in this Part are to be used in any proceeding to establish or modify child support filed on or after October 1, 1989. There shall be a rebuttable presumption that the amount of child support obtained by use of the guidelines set forth in this Part is the proper amount of child support.
>
> B. (1) The court may deviate from the guidelines set forth in this Part if their application would not be in the best interest of the child or would be inequitable to the parties. The court shall give specific oral or written reasons for the deviation, including a finding as to the amount of support that would have been required under a mechanical application of the guidelines and the particular facts and circumstances that warranted a deviation from the guidelines. The reasons shall be made part of the record of the proceedings.
>
> . . . .
>
> C. In determining whether to deviate from the guidelines, the court's considerations may include:

. . . .

    (5) An extraordinary community debt of the parties.

The supreme court explained in *Guillot v. Munn*, 99-2132, p. 9 (La. 3/24/00), 756 So.2d 290, 297, that since the child support guidelines are presumptively correct, "the party advocating a deviation bears the burden of proving the guideline amount is not in the best interest of the child or would be inequitable to the parties." The trial court cited *Guillot* for the proposition that deviations are warranted only in limited circumstances so as to ensure the adequacy and consistency of child support awards. *Id.*

Following review, we maintain the trial court's determination that a deviation as suggested by Karl was not demonstrated by competent evidence. Rather, the trial court remarked on the ambiguity of circumstances surrounding the debt in rejecting the request for deviation as follows:

> So, deviation we have an amount that I calculated in terms of gross monthly income. Deviations, when you look at the reported cases especially the ones that talk about community obligation, the court will find it was this, you will find, essentially, cases where during the marriage - - let me give some easy examples, credit card debt $100,000, expensive car notes, recurring monthly obligations that were paid during the community or being paid after the community. All of a sudden the parties split and you have one party paying all of it … and it is an extraordinary amount. That is a ground in my opinion for a deviation, a downward deviation. Why? Because you have proof that it was paid during the marriage, then you have the physical separation, the debt is still being maintained after. Here, what's different is how the loans on its face and what is in evidence it's a lawsuit on three or four, four promissory notes and the principle amounts are massive. However, in terms of those notes back in 2015. The gross monthly income again, was calculated by me really looking at 2017 I explained yesterday why I cannot consider 2016 but it's not an obligation that['s] currently being serviced. It's there and it's simply there but I'm just distinguishing between the cases. I cannot predict the future. I cannot predict what is going to happen with it. I have no idea what if a settlement is reached on that lawsuit. I have no idea, but I know this, it is inconsistent with, essentially, the cases for me to have a downward

deviation on those amounts that have been owed since the earliest was 2015, 2016, the principal balance was owed in 2017 then you have two notes owed and I'm using the 2017 numbers to calculate gross monthly income. Again, it's not a case - - how do you even deviate? But you have the amounts owed, these big principle amounts owed as reflected in the evidence. They are paid not in installments so you get the loan you don't owe it for another year when the crop comes well, now, all of a sudden you get the loan and then it's satisfied when the crops comes with one payment. So, one payment you pay off the balance of the loan. Prepaid the totality of the principle and the interest. No payments were evidently made and now, essentially, no payments were made and when I calculated income, no income coming in so to downward deviate from what? Downward deviation again, the best interest of the child or if there's an inequity I just - - it would be a pure guesstimate if I downward deviate why? For what? Downward deviate to a thousand, two thousand and it's so speculative, essentially, again, it's had no effect on monthly income as calculated by me for all the years that those notes have actually been outstanding or since the notes were actually contracted, for all those reasons it's just not a case where there is sufficient evidence, sufficient, positive, competent evidence that would be me a basis, an evidentiary basis to deviate with any sort of precision. Very different situation when I'm looking at, essentially, community obligations, the payor of child support but, again, essentially, huge credit card debts, what if you were servicing these debts each month and the note payments were massive? That is a little bit different story because then you have a monthly recurring amount on the obligation then I know, essentially, you can have more information to actually make a considered and evidentiary based determination of to deviate and how much to deviate but here I have nothing. Again, I've got nothing.

The trial court accurately remarked on the state of the evidence surrounding the claim on the purported community debt. Although the burden to prove the claimed deviation was Karl's, he presented the trial court only with information surrounding his past income found to be inconsistent with La.R.S. 9:315(C)(3)(c) and only general testimony regarding anticipated operations going forward. As the trial court explained, future servicing of the debt or proceedings related to the pending suit are speculative. In light of that absence of evidence, the trial court was left with only the positive evidence of 2017 income as presented by Mr. Rainey for application to the guidelines. This court has described those guidelines as mandatory.

14

*See Lord v. Lord*, 09-457 (La.App. 3 Cir. 11/4/09), 22 So.3d 1134, *writ denied*, 09-2634 (La. 2/12/10), 27 So.3d 849.

Accordingly, the trial court's determination is supported by the record.

Imputed Income

In his final argument regarding child support, Karl again relates his poor financial circumstances in arguing that the trial court's assessment of $15,8874.47 gross monthly income was erroneous. He asserts in brief that, as many farmers cannot repay their farm loans, some "fall into a category of businessmen who continue farming and continue to accumulate debt to the bank. At some point they will stop farming, get sued for the debts they owe, file bankruptcy, or a combination of the foregoing." He further maintains that "the parties' farm netting any significant revenue from crops is fantasy" and that this lack of revenue should have been considered by the trial court in its shaping of gross monthly income. He suggests a lesser income be imputed to him or that a remand would be appropriate for consideration of the Louisiana Occupation Employment and Wage Survey.

This argument, however, operates outside of the legislation controlling the court's assessment of gross monthly income. Louisiana Revised Statutes 9:315(C)(3)(c) is specific to "income" rather than profit and is applicable to "income from self-employment[.]" Notwithstanding Karl's bleak farming projections, the trial court correctly applied the statutory framework, albeit doing so on the limitations of the parties' evidence. The trial court simply determined that Karl's chosen evidence was unreliable for the type of deviation suggested. That decision is supported by the record and is not manifestly erroneous.

15

*Interim Spousal Support*

In his final assignment of error, Karl questions the trial court's assessment of interim spousal support, in particular addressing the calculation of his net monthly income in the amount of $14,0604.52. As above, he returns to what he describes as the couple having lived off of "borrowed money" and having done so "well beyond their means." He also returns to his contention that the trial court should have considered the parties' income in terms of a community enterprise. We do not return to either assertion as the trial court's assessment of income and the inapplicability of the community enterprise concept have been discussed at length above.

To the extent Karl argues that Alanna failed to meet her burden of proving entitlement to support under La.Civ.Code arts. 111 and 112,[7] we find no manifest error in the trial court's determination otherwise. In ruling, the trial court referenced Alanna's affidavit of income and expenses, making certain adjustments as it deemed necessary following Alanna's testimony. Those findings are supported by review of the record, as is the trial court's assessment of Karl's ability to pay based upon his income as calculated.

We find that this final assignment of error lacks merit.

---

[7] Louisiana Civil Code Article 111 provides that:

> In a proceeding for divorce or thereafter, the court may award interim periodic support to a party or may award final periodic support to a party who is in need of support and who is free from fault prior to the filing of a proceeding to terminate the marriage in accordance with the following Articles.

Specific to interim spousal support, La.Civ.Code art. 113(A) provides, in part: "Upon motion of a party, the court may award a party interim spousal support based on the needs of that party, the ability of the other party to pay, any interim or final child support obligation, and the standard of living of the parties during the marriage."

**DECREE**

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this proceeding are assessed to Appellant, Karl Jude Hensgens.

**AFFIRMED.**